# IN THE SUPREME COURT OF CALIFORNIA

BRENNON B.,
Petitioner,

v.

THE SUPERIOR COURT OF CONTRA COSTA COUNTY,
Respondent;

WEST CONTRA COSTA UNIFIED SCHOOL DISTRICT et al.,
Real Parties in Interest.

S266254

First Appellate District, Division One
A157026

Contra Costa County Superior Court
MSC1601005

August 4, 2022

Justice Groban authored the opinion of the Court, in which
Chief Justice Cantil-Sakauye and Justices Corrigan, Liu,
Kruger, Jenkins, and Guerrero concurred.

BRENNON B. v. SUPERIOR COURT

S266254

Opinion of the Court by Groban, J.

Brennon B. is a young man with developmental disabilities; when he was a teenager, he was a special-education student at De Anza High School in the West Contra Costa Unified School District (the District). Brennon alleges that during his time there, he was repeatedly sexually assaulted by other students and by a school-district staff member. In 2016, his guardian sued the District on his behalf, asserting various claims arising out of Brennon's experiences at De Anza High School; those claims included allegations the District had violated the Unruh Civil Rights Act (Civ. Code, § 51; the Unruh Civil Rights Act or the Act).

The question before us is whether a plaintiff who asserts such claims can hold a public school district liable under the Act and thus avail him- or herself of the enhanced remedies — particularly statutory penalties and attorney fees — it makes available. For the reasons set forth below, we hold that Unruh Civil Rights Act liability is not available in such circumstances. Accordingly, the judgment of the Court of Appeal denying Brennon's petition for writ of mandate is affirmed.

The statutory text of the Act, its purpose and history, and our prior caselaw all indicate that public schools, as governmental entities engaged in the provision of a free and public education, are not "business establishments" within the meaning of the Act. (Civ. Code, § 51, subd. (b).) To the contrary,

they make clear that the Act was not enacted to reach this type of state action. Accordingly, we conclude that the District was not a "business establishment" for purposes of the Unruh Civil Rights Act under the circumstances alleged here.

We must also reject Brennon's alternative argument that he can nonetheless avail himself of the Act's enhanced remedies either because of a 1992 amendment to the Unruh Civil Rights Act or because of a 1998 amendment to the Education Code. First, Brennon contends that public school districts can be sued under the Unruh Civil Rights Act because violations of the federal Americans with Disabilities Act (the ADA) were made actionable pursuant to the 1992 amendment. This contention is foreclosed by the language and legislative history of the 1992 amendment, which contains no indication that incorporation of the ADA was intended to broaden the reach of the Unruh Civil Rights Act in the way Brennon contends. The argument is also at odds with our prior decisions and in tension with the structure of other antidiscrimination statutes. Second, there is nothing in the language or legislative history of the 1998 Education Code amendment to suggest that it entitles Brennon to relief under the Unruh Civil Rights Act. We do not believe the Legislature — in either instance — would have made such a significant change to the scope of the Act without clear language in the statutory text and without any discussion of such a change in the legislative history.

As we have done previously, "[w]e emphasize . . . that our resolution of the legal issue[s] before us does not turn upon our personal views as to the wisdom or morality of the [laws and policies at issue in this case]. Instead, our task involves . . . question[s] of statutory interpretation." (*Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594, 598 (*Warfield*); see

also *Curran v. Mount Diablo Council of the Boy Scouts* (1998) 17 Cal.4th 670, 672 (*Curran*) [similar].) Discrimination in schools is pernicious, and its elimination requires the availability of legal tools that are both practical and powerful. At the same time — through the Education Code, the antidiscrimination components of the Government Code, and various other constitutional and statutory provisions — the Legislature has enacted laws that prohibit discrimination and make remedies available to those whose rights have been violated. (See, e.g., Ed. Code, § 200 et seq.; Gov. Code, § 11135; 42 U.S.C. § 1983; 20 U.S.C. § 1681 et seq.; 42 U.S.C. § 12131 et seq.)

The dispute here is not about whether Brennon and other plaintiffs who prove discrimination are entitled to relief — they clearly are. (See *Brennon B. v. Superior Court* (2020) 57 Cal.App.5th 367, 370 (*Brennon B.*) [discussing antidiscrimination laws to which public school districts are subject].) This case is about whether Brennon and other putative plaintiffs are entitled to pursue the specific remedies made available under the Unruh Civil Rights Act. Brennon and supporting amici curiae argue that the availability of such relief is important because it entitles successful plaintiffs to statutory penalties for each and every discriminatory offense — up to a maximum of three times the amount of actual damage and in no case less than $4,000.[1] It would also entitle plaintiffs to attorney fees, which, in matters of this degree of complexity, can be considerable. Brennon and several amici curiae also argue that

---

[1] The District argues that even if the Unruh Civil Rights Act applies, treble damages would not be available against a public-entity defendant. We need not decide that issue here.

these heightened penalties are — for policy reasons — the most effective means of vindicating the rights of disabled students in California. They assert that these remedies encourage disabled people to assert their rights, deter institutions from engaging in discrimination, and help to incentivize lawyers to litigate discrimination claims. In response, the District and its supporting amici curiae assert that subjecting public school districts to the heightened remedies made available by the Act would — in light of school districts' already strained and limited budgets — undermine districts' ability to deliver high quality education for their students. The District also underscores that, even without Unruh Civil Rights Act protection, there are many other statutes prohibiting discrimination that enable students to obtain appropriate relief.

Again, the policy question of whether to make the Act's enhanced remedies available in this context, and how to weigh the various competing interests at stake, is a decision that only the Legislature can make. The task before us today is one of statutory interpretation.

## I.

## A.

Brennon has autism, low verbal skills, and mental and cognitive impairment. Throughout the time in question (during which Brennon was a teenager), his mental and emotional capacity was equivalent to that of a six- to seven-year-old child.[2]

---

[2]     Because this action arises from a writ petition challenging the trial court's order sustaining a demurrer, we take the facts as they are stated in Brennon's second amended complaint. (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 571.)

From 2012 to 2016, he was enrolled at De Anza High School in the West Contra Costa Unified School District as a special-education student with an individualized education plan (IEP). While there, he required a heightened level of supervision to protect him from sexual assault.

In 2012, Brennon was sexually assaulted in the school restroom by another student; that student was unsupervised at the time of the assault despite the fact his own IEP required he be supervised while in the restroom. Thereafter, Brennon's IEP was amended to require *continuous* supervision while on campus. Brennon sued the District as a result of this incident and obtained a judgment against it. In 2013, Brennon reported that he had been kissed while on the school bus by another student, and Brennon's IEP was again amended to require supervision on the bus. Despite this requirement, in 2014, Brennon was again forcibly kissed by the same student after Brennon's assigned supervisor left him unsupervised on the bus.

Additionally, an aide assigned by the District to supervise Brennon at school sexually assaulted Brennon on at least four occasions between 2012 and 2014. On these occasions, the aide forced Brennon to orally copulate him. The aide ultimately confessed to police and was charged with multiple felonies. In 2015, Brennon was sexually and physically assaulted by fellow students on three occasions when he was left unsupervised on campus.

In July 2015, Brenda B. — Brennon's guardian — filed a claim on his behalf under Government Code sections 900 to 915.4, the statutes authorizing claims against public entities. The District denied the claim, and shortly thereafter, Brennon commenced the instant litigation against the District and

5

several individual staff members. The operative complaint alleges causes of action for: negligence; negligent hiring and supervision; intentional infliction of emotional distress; violation of the right to petition; and violation of the Unruh Civil Rights Act. As is relevant here, the District demurred to the Unruh Civil Rights Act cause of action on the ground that the District was not a "business establishment" within the meaning of the Act. The trial court agreed and sustained the District's demurrer to that cause of action without leave to amend.

Brennon filed an original petition for writ of mandate in the Court of Appeal. The court issued an order to show cause. After the matter was set for oral argument, Brennon informed the Court of Appeal that the case had settled and requested dismissal of the petition. That request was denied, and the matter proceeded to argument. Thereafter, the Court of Appeal issued a published opinion, concluding that the trial court had not erred; it denied the petition for writ of mandate, and Brennon petitioned this court for review. Despite the fact that the parties had already settled, we granted review to decide two issues of continued statewide importance: (1) whether a public school district is a "business establishment" for purposes of the Unruh Civil Rights Act (or, if not, whether Unruh Civil Rights Act remedies are still available because they have been incorporated into the relevant provisions of the Education Code); and (2) even if a school district is not a business establishment, whether it can nevertheless be sued under the Unruh Civil Rights Act where the alleged discriminatory conduct is actionable under the Americans with Disabilities Act (42 U.S.C. § 12101 et seq.).

**B.**

As noted above, the Unruh Civil Rights Act is codified at section 51 of the Civil Code.[3]  (See Civ. Code, § 51, subd. (a).) The questions raised by this case implicate two of its provisions. First, subdivision (b) of section 51 reads: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services *in all business establishments of every kind whatsoever*." (*Id.* § 51, subd. (b), italics added.)  Second, subdivision (f) of section 51 states:  "A violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section." (*Id.* § 51, subd. (f).)  Brennon contends that the phrase "business establishments" in subdivision (b) encompasses public school districts, and that — even if it does not — the addition of subdivision (f) makes public school districts liable under the Unruh Civil Rights Act when they violate the ADA.

As discussed below, the Unruh Civil Rights Act was enacted by the Legislature in 1959 in "response to a number of appellate court decisions that had concluded that the then-existing public accommodation statute did not apply to" various private businesses. (*Curran, supra,* 17 Cal.4th at p. 687.)  The new legislation was intended "to revise and expand the scope of the then-existing version of section 51." (*Ibid.*)  The Act has

---

[3]    All further unspecified citations are to the Civil Code.

been amended several times since then, most notably — for purposes of this case — in 1992, when "the Legislature amended section 51 to, among other changes, add the paragraph that became subdivision (f), specifying that '[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section.'" (*Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 668 (*Munson*), citing Stats. 1992, ch. 913, § 3, p. 4284; Stats. 2000, ch. 1049, § 2.)

In addition, Brennon contends this case also implicates a provision of the Education Code, specifically subdivision (g) of section 201. Section 201 of the Education Code was first enacted in 1982. It was later amended in 1998, when the Legislature added — among other things — subdivision (g), a paragraph explaining the Legislature's preferred interpretation of the statute. (See Stats. 1998, ch. 914, § 5, subd. (g).) Subdivision (g) of Education Code section 201 provides: "It is the intent of the Legislature that this chapter shall be interpreted as consistent with . . . the Unruh Civil Rights Act . . . , except where this chapter may grant more protections or impose additional obligations, and that the remedies provided herein shall not be the exclusive remedies, but may be combined with remedies that may be provided by the above statutes." (Ed. Code, § 201, subd. (g).) Brennon contends that — even if he cannot hold the District liable under the Unruh Civil Rights Act itself — he can seek the Act's enhanced remedies because subdivision (g) of Education Code section 201 makes those remedies available for violations of the Education Code.

## II.

### A.

" 'When we interpret a statute, "[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. . . . If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." [Citation.] "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' " (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616–617 (*City of San Jose*), quoting *Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 165–166.)

*1.*

With respect to Brennon's primary argument, the statutory text at issue is the phrase "all business establishments of every kind whatsoever" as it appears in the Unruh Civil Rights Act. (Civ. Code, § 51, subd. (b).) As noted above, we begin by giving this phrase its " 'plain and commonsense meaning' " as it is understood " 'in the context of the statutory framework as a whole.' " (*City of San Jose, supra,* 2 Cal.5th 608 at p. 616.)

We find that Brennon's proposed reading does not fit easily with the statutory text. The everyday meaning of "business establishments" — even with the statute's expansive "of every kind whatsoever" clause — conveys reference to

commercial entities, those whose principal mission is the transactional sale of goods or services. The Oxford English Dictionary identifies "the most common sense" of "business" as "[t]rade and all activity relating to it, esp. considered in terms of volume or profitability; commercial transactions, engagements, and undertakings regarded collectively; an instance of this." (Oxford English Dict. (3d ed. 2022) <https://www.oed.com/view/Entry/25229> [as of June 21, 2022].[4]) Merriam-Webster defines "business" as "a usu. commercial or mercantile activity engaged in as a means of livelihood"; "a commercial or sometimes an industrial enterprise"; "dealings or transactions esp. of an economic nature." (Merriam-Webster's Collegiate Dict. (11th ed. 2014) p. 167.) A public school district engaged in the task of educating its students does not easily fit within these definitions. We do not dispute that a school district provides a service to members of the public, as Brennon argues, but a school district's provision of public education is not generally understood as being carried out in the commercial, transactional manner that is characteristic of a "business establishment."

Nonetheless, our prior cases counsel that "the reach of section 51 cannot be determined invariably by reference to the apparent 'plain meaning' of the term 'business establishment.' " (*Warfield, supra,* 10 Cal.4th at p. 616; see also *Curran, supra,* 17 Cal.4th at p. 693 [quoting *Warfield*].) Instead, some entities that would not ordinarily "be thought of as . . . 'traditional' business establishment[s]" should be considered business establishments for purposes of the Unruh Civil Rights Act. (*Warfield,* at p. 616.) And more generally, whether or not an

---

[4] This internet citation is archived by year, docket number and case name at < http://www.courts.ca.gov/38324.htm>.

entity is "generally thought of as a traditional business establishment is not, in itself, necessarily determinative of whether such an entity falls within the aegis of the act." (*Ibid.*) Thus, our precedent urges us to look beyond the statutory language to "the purpose and history of section 51" in order to determine whether "the Legislature intended the statute to apply to the conduct of the entit[y] at issue" here. (*Ibid.*)

## 2.

The purpose and legislative history of the Unruh Civil Rights Act — and its predecessor statute — make clear that the focus of the Act is the conduct of *private business establishments*. These laws were originally enacted in response to limitations placed by the U.S. Supreme Court on the federal government's ability to pass laws targeting the conduct of private entities; the actions of state actors were not the focus of the state's first public accommodations laws or of the Unruh Civil Rights Act.

With respect to coverage of public school districts specifically, during the legislative process that led to the enactment of the Act, the Legislature progressively narrowed the kinds of schools to which it might have applied and eventually eliminated any reference to schools altogether; viewed in the context of the legislative history as a whole, this evolution suggests the Legislature did not intend the Act to subject public school districts to liability for claims such as those raised here. Instead, the catchall phrase appearing in the final version of the legislation — "all business establishments of every kind whatsoever" — covers entities engaged in the kinds of commercial transactions characteristic of "business establishments"; it cannot be stretched to reach a state actor "carry[ing] out the state's constitutionally mandated duty to

provide a system of public education." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1195 (*Wells*).)

The roots of the modern-day Unruh Civil Rights Act go back to the late 1800s. (*Warfield, supra*, 10 Cal.4th at pp. 607–608.) In 1883, the U.S. Supreme Court "invalidated the first federal public accommodation statute." (*Id.* at p. 607.) That statute had prohibited private entities from discriminating on the basis of race when operating "accommodations, advantages, facilities, and privileges of inns, public conveyances on land or water, theatres, and other places of public amusement." (*Civil Rights Cases* (1883) 109 U.S. 3, 9.) The court held the statute was invalid under the Fourteenth Amendment because it targeted the actions of private persons, rather than state actors. (*Id.* at pp. 10–11.) The court explained: "It is State action of a particular character that is prohibited. Individual invasion of individual rights is not the subject-matter of the [Fourteenth Amendment]." (*Id.* at p. 11.) It was therefore for state legislatures, not Congress, to enact laws regulating the conduct of non-state actors. (*Id.* at p. 13.) In response to the Supreme Court's decision, "California joined a number of other states in enacting its own initial public accommodation statute, the statutory predecessor of . . . section 51 [of the Civil Code]" (*Warfield, supra*, 10 Cal.4th at pp. 607–608, citing Stats. 1897, ch. 108, § 2, p. 137), which applied to all "places of public accommodation or amusement" (*id.* at p. 608).

As the Court of Appeal below noted after reviewing this history, "nothing in the historical context from which the Unruh Act emerged suggests the state's earlier public accommodation statutes were enacted to reach 'state action.' And there is [substantial] authority to the contrary — that these statutes were enacted to secure within our state law the prohibition

against discrimination by privately owned services and enterprises the United States Supreme Court referenced in the *Civil Rights Cases* and which the common law had already begun to recognize through the public service doctrine." (*Brennon B., supra,* 57 Cal.App.5th at p. 372, citing *Curran, supra,* 17 Cal.4th at pp. 686–687; *Warfield, supra,* 10 Cal.4th at pp. 607–608; Horowitz, *The 1959 California Equal Rights in "Business Establishments" Statute — A Problem in Statutory Application* (1960) 33 So.Cal. L.Rev. 260, 281 (hereafter Horowitz) ["[i]t was clear that in [former] [Civil Code] Sections 51 and 52 the Legislature enacted a principle creating a right not to be discriminated against on grounds of race in some, but not all, relationships between private persons"].)

As time went on, however, the efficacy of California's early public accommodations law was curtailed by "lower appellate courts [that] used the principle *ejusdem generis* to limit the law's reach." (*Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 78 (*Isbister*).) Following a series of restrictive judicial decisions in the 1950s (which occurred despite ongoing legislative *expansion* of the law's coverage), the Legislature enacted the Unruh Civil Rights Act in 1959 "out of concern that the courts were construing the . . . public accommodations statute [of that time] too strictly." (*Ibid.*; see also *id.* at pp. 78–79 [noting legislative "additions to the list of covered facilities" and citing *Reed v. Hollywood Professional School* (1959) 169 Cal.App.2d Supp. 887, 890 [private school not covered]; *Coleman v. Middlestaff* (1957) 147 Cal.App.2d Supp. 833, 834–836 [dentist's office not covered]; *Long v. Mountain View Cemetery Assn.* (1955) 130 Cal.App.2d 328, 329 [private cemetery not covered]].) The intention behind the 1959 legislation was "to revise and expand the scope of the then-

existing version of section 51." (*Warfield*, *supra*, 10 Cal.4th at p. 608.)

The bill that ultimately became the Unruh Civil Rights Act was introduced in January 1959. (Assem. Bill No. 594 (1959 Reg. Sess.) (Assembly Bill 594), as introduced Jan. 21, 1959.) As initially drafted, Assembly Bill 594 mentioned schools as one of the numerous entities covered by the bill. (*Ibid.*) However, as chronicled by the Court of Appeal below, the bill subsequently underwent a series of amendments, which ultimately eliminated reference to schools altogether. (*Brennon B.*, *supra*, 57 Cal.App.5th at pp. 375–377; see also *Curran, supra,* 17 Cal.4th at p. 687, fn. 13; Horowitz, *supra*, 33 So.Cal. L.Rev. at pp. 265–270 [tracing the progression of the amendments and describing the legislation's "narrowing"].)

More specifically, the language in the first version of the bill included "schools" without any qualification of that word. (*Brennon B.*, *supra*, 57 Cal.App.5th at p. 374.) However, each subsequent amendment narrowed the group of schools to which the law would apply. (*Id.* at pp. 375–377.) "Schools" first became "all schools of every kind whatsoever, except those schools organized for the purpose of, and which practice, the furthering of a specific sectarian religious belief" (*id.* at p. 375), which then became "all schools of every kind whatsoever, except those schools organized for the purpose of, and which practice, the furthering of a specific sectarian religious belief, insofar as the facilities of any such school so organized and following such practice are made available primarily to persons who subscribe to such belief" (*id.* at p. 376, italics omitted), which in turn became "all schools which primarily offer business or vocational training" (*ibid.*). In the final version of the bill, any reference to schools was removed, and the legislation simply referred to "all

business establishments of every kind whatsoever." (*Id.* at p. 377, citing Horowitz, *supra*, 33 So.Cal. L.Rev. at pp. 269–270 & fn. 37.)

Brennon contends the breadth of the phrase "all business establishments of every kind whatsoever" (Civ. Code, § 51, subd. (b)) indicates the Legislature intended the Act to cover public schools, despite removal of the reference to schools in the final version of the bill. However, a better reading of the bill's legislative history is that the Legislature ultimately decided not to include school districts — which are not typically understood as "business establishments" — within the ambit of the legislation. Our reading is supported by the fact that "the prior versions of the bill reflect a progressive narrowing of the legislation's applicability to 'schools' " before the reference to schools was completely eliminated. (*Brennon B.*, *supra*, 57 Cal.App.5th at p. 378.) In fact, "the category of schools to which the penultimate version of the legislation applied would not have included any public grammar schools or even public secondary schools." (*Ibid.*) Moreover, these changes to potential coverage of schools continued, all while the phrase "all business establishments of every kind whatsoever" remained untouched. We conclude that this history, on the whole, is at odds with Brennon's preferred interpretation.

Brennon's argument is not salvaged by the fact that the phrase "business establishments" should be understood "in the broadest sense reasonably possible." (*Burks v. Poppy Construction Co.* (1962) 57 Cal.2d 463, 468 (*Burks*).) We have previously explained that the Unruh Civil Rights Act applies only where an entity's "activities reasonably could be found to constitute a *business establishment*." (*Warfield*, *supra*, 10 Cal.4th at p. 615, italics added.) Nothing "suggests that the

term 'all business establishments of every kind whatsoever' was intended to encompass *all* of the entities or activities listed in the initial bill." (*Ibid.*) While the phrase "all business establishments of every kind whatsoever" must be interpreted as broadly as reasonably possible, its scope remains limited to entities acting as private business establishments.

In addition, the Legislature is capable of bringing government entities within the scope of specific legislation when it intends to do so, and it *has* done so with other antidiscrimination legislation. (See, e.g., *Wells*, *supra*, 39 Cal.4th at pp. 1190–1191 [discussing application of the Fair Employment and Housing Act (FEHA) to public entities].) In the context of the Unruh Civil Rights Act, however, "the statutory list of [covered entities] contains no words or phrases most commonly used to signify public school districts, or, for that matter, any other public entities or governmental agencies." (*Id.* at p. 1190.) The Act does not — as *does* FEHA, for example — define the covered entities to include "the state or any political or civil subdivision of the state, and cities." (Gov. Code, § 12926, subd. (d).) As we have previously explained, "[t]he specific enumeration of state and local governmental entities in one context [such as the Fair Employment and Housing Act], but not in the other [here, the Unruh Civil Rights Act], weighs heavily against a conclusion" that the coverage provisions should be understood as identical. (*Wells*, at p. 1190.) That is especially true where, as here, the statutes' coverage provisions were drafted by the very same Legislature during the same legislative session; the legislative history is, thus, strong evidence that the Legislature crafted language for FEHA to explicitly cover governmental entities, while simultaneously crafting language

for the Unruh Civil Rights Act that sets forth *different* coverage.[5]

This history shows that the Unruh Civil Rights Act is focused on the actions of private actors. Its predecessor statute was enacted in response to the curtailment of the federal government's ability to legislate on the conduct of *private entities*, and we find nothing in the legislative history of the Act to indicate that it drastically expanded California's public accommodation law by imposing liability on public entities, such that it would cover the conduct challenged here. For the reasons discussed above, we reject the contention that the mere inclusion of "schools" in earlier versions of the bill establishes that public schools are business establishments under the Act. To the contrary, we conclude that, in passing the Unruh Civil Rights Act, the Legislature enacted a law directed at entities operating as private businesses.[6]

---

[5] Although not drafted during the same legislative session as the Unruh Civil Rights Act and FEHA, other statutes further demonstrate that the Legislature knows how to use language to specifically prohibit discrimination by public schools. (See, e.g., Ed. Code, § 200 [noting that "[i]t is the policy of the State of California to afford all persons in public schools . . . equal rights, and opportunities in the educational institutions of the state"]; Gov. Code, § 11135, subd. (a) ["[n]o person in the State of California shall . . . be unlawfully subjected to discrimination under . . . any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state"].)

[6] Amici curiae on behalf of Brennon contend that a 2015 law shows that the Unruh Civil Rights Act does cover public schools. That year, the Legislature enacted Assembly Bill 302, which

### 3.

The conclusion urged by the legislative history — that the Legislature did not intend for the Unruh Civil Rights Act to cover public school districts through its use of the phrase "business establishments" — is further underscored by the reasoning and principles set forth in our prior cases. Although these cases do not directly resolve the issues presented here (because all involved private, rather than public, entities), what they ultimately make clear is that — in order to be a "business establishment" under the Act — an entity must operate as a business or commercial enterprise when it discriminates.

In *Burks*, the court held that a developer and seller of tract houses was subject to the Act because "[t]he word 'business' embraces everything about which one can be employed, and it is often synonymous with 'calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain,' " and "[t]he word 'establishment' . . . includes not only a fixed location, such as the 'place where one is permanently fixed for residence or business,'

requires schools to provide lactation accommodations to students. (Assem. Bill No. 302 (2015–2016 Reg. Sess.), Stats. 2015, ch. 690, § 2, codified at Educ. Code. § 222.) In uncodified findings and declarations accompanying the law, the Legislature stated: "The Unruh Civil Rights Act (Section 51 of the Civil Code) prohibits businesses, including public schools, from discriminating based on sex, which includes discrimination on the basis of pregnancy, childbirth, or medical conditions related to pregnancy or childbirth." (Stats. 2015, ch. 690, § 1.) However, nothing in Education Code section 222 or the bill's legislative history ever mentioned the Unruh Civil Rights Act; thus, the reference to the Act in the uncodified legislative findings and declarations of Assembly Bill 302 adds little — or nothing — to our analysis of whether public school districts are covered by the Unruh Civil Rights Act.

but also a permanent 'commercial force or organization.'" (*Burks, supra*, 57 Cal.2d at p. 468.)

In *O'Connor v. Village Green Owners Association*, the court concluded that a nonprofit homeowners association was subject to the Act because "the [homeowners] association *performs all the customary business functions* [e.g., employing a property management firm, obtaining insurance, collecting assessments, and enforcing rules] which in the traditional landlord-tenant relationship rest on the landlord's shoulders . . . [and because the HOA's] *overall function is to protect and enhance the project's economic value*." (*O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790, 796, italics added (*O'Connor*).)

In *Isbister*, the defendant (a nonprofit recreational club that prohibited girls from using its facilities) argued that it was not a business establishment for purposes of the Act. (*Isbister*, *supra*, 40 Cal.3d at p. 78.) The *Isbister* court began its opinion by stating: "Absent the principle it codifies, thousands of facilities *in private ownership, but otherwise open to the public*, would be free under state law to exclude people for invidious reasons like sex, religion, age, and even race." (*Id.* at p. 75, italics added.) It went on to observe that, despite its nonprofit status, the club was "functional[ly] similar[] to a commercial business" (*id.* at p. 83, fn. omitted) and was therefore covered by the Act (*id.* at p. 82).

In *Warfield*, the court held that a nonprofit golf and country club (that excluded women from proprietary membership) came within the purview of the Act. In reaching that conclusion, the court noted "*the business transactions that are conducted regularly on the club's premises with persons who*

*are not members of the club* are sufficient in themselves to bring the club within the reach of section 51's broad reference to 'all business establishments of every kind whatsoever.' " (*Warfield, supra,* 10 Cal.4th at p. 621, original italics.) Specifically, the court found that the club "appear[ed] to have been operating in a capacity that is the functional equivalent of a commercial enterprise." (*Id.* at p. 622; see also *id.* at pp. 621, 622 [describing the club's semi-public catering and event-hosting services as well as its public golf and tennis shops].)

By contrast, in *Curran, supra,* 17 Cal.4th 670, the court held that — on the specific facts of the case — a regional council of the Boy Scouts of America was not subject to the Act because the Act did not reach "the membership decisions of a charitable, expressive, and social organization . . . whose formation and activities are unrelated to the promotion or advancement of the economic or business interests of its members." (*Id.* at p. 697.) Nonetheless, the court also concluded the Act "would apply to, and would prohibit discrimination in, the actual business transactions with nonmembers engaged in by the Boy Scouts in its retail stores." (*Id.* at p. 700; but see *id.* at p. 731 (conc. opn. of Werdegar, J.) [criticizing this "function-by-function," "piecemeal mode of analysis"].)

Consistent with the legislative history, these prior cases tend to suggest that the Unruh Civil Rights Act, like its predecessor statutes, is not directed at school districts when they are acting to fulfill their educational role. In parsing the boundaries of what constitutes a "business establishment," our cases have focused on attributes — performing business functions, protecting economic value, operating as the functional equivalent of a commercial enterprise, etc. — that are not shared by public school districts engaged in the work of

educating students. When acting in their core educational capacity, public school districts do not perform "customary business functions," nor is their "*overall function* . . . to protect and enhance . . . economic value." (*O'Connor*, *supra*, 33 Cal.3d at p. 796, italics added.) The task of educating students does not involve regularly conducting business transactions with the public, or receiving "financial benefits from regular business transactions"; nor does it involve "operating in a capacity that is the functional equivalent of a commercial enterprise." (*Warfield*, *supra*, 10 Cal.4th at pp. 621, 622.)

Educating students is a task that is fundamentally different from what could fairly be described as "regular business transactions" (*Warfield, supra*, 10 Cal.4th at p. 621); public school districts are responsible for the provision of free and public education pursuant to a state constitutional mandate (Cal. Const., art. IX, § 5). "[A]lthough administered through local districts created by the Legislature," the State's system of public schools "is '*one* system . . . applicable to all the common schools.' " (*Butt v. State of California* (1992) 4 Cal.4th 668, 680, quoting *Kennedy v. Miller* (1893) 97 Cal. 429, 432.) "[T]he management and control of the public schools [is] a matter of state care and supervision" (*Kennedy*, at p. 431), and "[l]ocal districts are the State's agents for local operation of the common school system" (*Butt*, at p. 681). This is a far cry from the typical operation of a "business establishment," the protection of economic value, the nature of a traditional public accommodation, or the equivalent of a commercial enterprise. For all of these reasons, our case law underscores what the legislative history makes clear: the Unruh Civil Rights Act does not reach public school districts engaged in the provision of a free and public education to students.

*4.*

In examining decisions both from the Courts of Appeal and by the federal courts, we find nothing that persuades us that the outcome urged by the legislative history and favored by our prior cases should be rejected. Instead, such cases further indicate that to be a "business establishment" under the Act an entity must effectively operate as a business or a commercial enterprise or "engage[] in behavior involving sufficient 'businesslike attributes.' " (*Carter v. City of Los Angeles* (2014) 224 Cal.App.4th 808, 825 (*Carter*), quoting *Qualified Patients Assn v. City of Anaheim* (2010) 187 Cal.App.4th 734, 764–765 (*Qualified Patients*).) Generally speaking, public school districts do not fit within this definition.

We turn first to the decisions from California Courts of Appeal. Several have concluded that government bodies do not function as "business establishments" when they enact legislation. (See, e.g., *Harrison v. City of Rancho Mirage* (2015) 243 Cal.App.4th 162, 175 ["Here, the City was not acting as a business establishment. It was amending an already existing municipal code section to increase the minimum age of a responsible person from the age of 21 years to 30"]; *Qualified Patients*, *supra*, 187 Cal.App.4th at p. 764 ["Because a city enacting legislation is not functioning as a 'business establishment[],' we conclude the [Unruh Civil Rights Act] does not embrace plaintiffs' claims against the city"]; *Burnett v. San Francisco Police Department* (1995) 36 Cal.App.4th 1177, 1191–1192 ["Nothing in the Act precludes *legislative bodies* from enacting ordinances which make age distinctions among adults"].) However, these cases do not address whether a state entity might, in other contexts, function as a business establishment for purposes of the Act.

A small number of decisions by our Courts of Appeal have suggested the Act *could* apply to public entities. In one of those cases, the public entity did not challenge the application of the Act, and the court never faced the question directly. (See *Mackey v. Trustees of California State University* (2019) 31 Cal.App.5th 640 [reversing a grant of summary judgment in favor of the state university on an Unruh Civil Rights Act claim by Black athletes].) In another case, the court did not extend the Act to public entities, but it briefly indicated approval of a potential rationale for doing so. (See *Gatto v. County of Sonoma* (2002) 98 Cal.App.4th 744, 769 [reversing judgment for the plaintiff — to the extent judgment was based on the Unruh Civil Rights Act — on the ground he was not a member of any relevant protected class, and discussing the potential applicability of the Act to a county fair].)

Other Courts of Appeal have considered the issue of public-entity defendants and suggested the Act would *not* apply to them, but, here too, none ruled on the issue definitively. (See, e.g., *Carter*, *supra*, 224 Cal.App.4th at pp. 814, 825 [refusing to approve release of plaintiffs' Unruh Civil Rights Act claims in a class action against the City of Los Angeles because plaintiffs "deserve[d] to litigate the merits of th[ose] claims" even though it was " 'highly questionable' " a California court would "consider a municipal entity to be liable under the Unruh Civil Rights Act"]; *Doe v. California Lutheran High School Assn.* (2009) 170 Cal.App.4th 828, 839 [concluding that a private, religious high school was not a business establishment because it was a nonprofit that lacked any "significant resemblance to an ordinary for-profit business" and suggesting that the same reasoning would apply to public schools]; see also *id.* at p. 841.)

Neither the holdings nor the reasoning in any of these cases counsels in favor of disturbing the conclusion that is compelled by the legislative history of the Act and consistent with our prior cases. These cases simply indicate that a government body enacting legislation is not subject to the Act, and they reveal that some courts dealing with the Act have suggested it might apply to public entities, while others have rejected (or expressed skepticism about) application of the Act to such entities. Again, nothing in these cases unsettles the conclusion reached above.

We turn next to the federal cases, which have directly addressed the question presented here, although " 'federal decisional authority is neither binding nor controlling in matters involving state law.' " (*Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4th 39, 55, quoting *Howard Contracting, Inc. v. G.A. MacDonald Construction Co.* (1998) 71 Cal.App.4th 38, 52.)

As the Court of Appeal in this case noted, "federal courts have split on the question" of whether public school districts are business establishments under the Unruh Civil Rights Act (*Brennon B.*, *supra*, 57 Cal.App.5th at p. 391), with the majority concluding that public school districts *are* subject to the Act (see, e.g., *Z. T. Santa Rosa City Sch.* (N.D.Cal., Oct. 5, 2017, No. C 17-01452 WHA) 2017 WL 4418864, at *6 (*Z.T.*) [noting, prior to the recent emergence of a federal split, that "[e]very California district court decision to reach the question has answered it in the affirmative, frequently referencing the California Supreme Court's admonition that the Unruh Act be interpreted 'in the broadest sense reasonably possible,' " quoting *Isbister*, *supra*, 40 Cal.3d at p. 76]). However, most of those federal cases rely principally on *Sullivan ex rel. Sullivan v. Vallejo City Unified*

*School Dist.* (E.D.Cal. 1990) 731 F.Supp. 947, which — prior to our decision in *Warfield* — concluded that "since public schools were among those organizations listed in the original version of the Unruh Act, it must follow that for purposes of the Act they are business establishments as well." (*Sullivan*, at p. 953, fn. omitted.) Importantly, as discussed earlier, in *Warfield* we expressly rejected the idea that the mere mention of a particular entity in the initial version of the Unruh Civil Rights Act legislation brings that entity within the ambit of the Act. (See *Warfield*, *supra*, 10 Cal.4th at p. 615.) Thus, contrary to *Sullivan*'s reasoning, the mere mention of "schools" in the original version of the Act does not mean that public school districts are business establishments. With that basis for its conclusion gone, there is little left in *Sullivan* to support the conclusion it reached.

And because we disagree with the conclusion reached in *Sullivan*, we are also unpersuaded by the body of cases that rely on it cursorily to conclude that public school districts are business establishments for purposes of the Act. (See, e.g., *Nicole M. ex rel. Jacqueline M. v. Martinez Unified Sch. Dist.* (N.D.Cal. 1997) 964 F.Supp. 1369, 1388; *Walsh v. Tehachapi Unified Sch. Dist.* (E.D.Cal. 2011) 827 F.Supp.2d 1107, 1123.)[7]

---

[7] Several other federal cases go beyond mere reliance on *Sullivan*, but we agree with the Court of Appeal's conclusion that these cases do not adequately examine "the historical genesis of the [Unruh Civil Rights Act], its legislative history, scholarly commentary, and the decisions of our high court." (*Brennon B.*, *supra*, 57 Cal.App.5th at p. 393, citing *Whooley v. Tamalpais Union High School Dist.* (N.D.Cal. 2019) 399 F.Supp.3d 986 and *Yates v. East Side Union High School District* (N.D.Cal., Feb. 20, 2019, No. 18-CV-02966-JD) 2019 WL 721313; see also, e.g., *Z. T., supra,* 2017 WL 4418864, at *6.)

By contrast, *Zuccaro v. Martinez Unified Sch. Dist.* (N.D.Cal., Sept. 27, 2016, No. 16-CV-02709-EDL) 2016 WL 10807692, was decided after our decision in *Warfield*, and it concluded that a public school district is not a business establishment under the Unruh Civil Rights Act.[8] We think *Zuccaro* has the better view. Unlike other district court cases, the *Zuccaro* court carefully examined our decision in *Curran* and found it made clear that "the entity at issue [must] resemble an ordinary for-profit business," and that a public school "is practically the antithesis of a for-profit enterprise." (*Zuccaro,* at *12.) The *Zuccaro* court concluded that "a public elementary school, particularly in its capacity of providing a free education to a" preschooler with disabilities, is "acting as a public servant rather than a commercial enterprise and is therefore not subject to the Unruh Act." (*Id.* at *13.)

As with the cases from California Courts of Appeal, our examination of the federal cases that have grappled with this

---

[8] While *Zuccaro* may be the only federal case to conclude that public school districts are not business establishments under the Unruh Civil Rights Act, several district courts have declined to apply the Act to other governmental entities and have sometimes noted it is not clear whether governmental entities may be held liable under the statute. (See, e.g., *Anderson v. County of Siskiyou* (N.D.Cal., Sept. 13, 2010, No. C 10-01428 SBA) 2010 WL 3619821, at *6 [jails are not covered by the Act]; *Romstad v. Contra Costa County* (9th Cir. 2002) 41 Fed.App'x. 43, 46 [county social services department not covered by the Act]; *Taormina v. California Department of Corrections* (S.D.Cal. 1996) 946 F.Supp. 829 [state prison does not qualify as a business establishment]; *Goodfellow v. Ahren* (N.D.Cal., Mar. 26, 2014, No. 13-04726 RS) 2014 WL 1248238, at *8 [questioning "the extent to which governmental entities may be held liable under the [Act]"].)

issue does not compel a different conclusion from the one compelled by the legislative history of the Unruh Civil Rights Act and supported by our prior cases. Accordingly, for all of the reasons discussed above, we conclude that — under subdivision (b) — the District was not a "business establishment" for purposes of the Act when it provided educational services to Brennon.

## B.

Brennon contends that, even if the District is not a business establishment under subdivision (b) of section 51, it can still be sued for discrimination by virtue of subdivision (f) of that section.[9] Added to the Unruh Civil Rights Act by a 1992 amendment, subdivision (f) makes a violation of the federal Americans with Disabilities Act of 1990 (Public Law 101-336) actionable under the Unruh Civil Rights Act. As the Court of Appeal explained, Brennon "reads this subdivision to mean any violation of the ADA by any person or entity is also a violation of the Act." (*Brennon B.*, *supra*, 57 Cal.App.5th at pp. 397–398.) By contrast, the District reads subdivision (f) to mean that "any violation of the ADA *by a business establishment* is also a violation of the [Unruh Civil Rights Act]." (*Id.* at p. 398.)

The District is correct. Neither the language of the subdivision nor its legislative history indicates it was intended

---

[9] Brennon's argument with respect to subdivision (f) of section 51 is not always clear. At times, he appears to contend that subdivision (f) subjects public school districts to liability even if they are not business establishments. Other times, he appears to contend that, after the enactment of subdivision (f), the phrase "business establishments" must be read to include all entities subject to the ADA. However, our analysis and ultimate conclusion would remain the same under either framing.

to bring about the monumental change suggested by Brennon: that *any* entity (public or private) that violates the ADA could be held liable under the Unruh Civil Rights Act (for acts of discrimination based on disability, but not other protected classes). And we do not think the Legislature — especially after more than three decades of history to the contrary (and almost a century of contrary history since the enactment of the Act's predecessor statute) — would have made such an enormous change to the reach of the Unruh Civil Rights Act in the absence of clear statutory language and without *any* discussion of such a modification in the legislative history. (See, e.g., *Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 647 ["It is doubtful that the Legislature would have instituted such a significant change through silence"].)

"In 1992, . . . the Legislature amended section 51 to, among other changes, add the paragraph that became subdivision (f), specifying that '[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section.' " (*Munson, supra*, 46 Cal.4th at p. 668, quoting Stats. 1992, ch. 913, § 3, p. 4284; see also Stats. 2000, ch. 1049, § 2 [adding subdivision designations].) To ascertain the Legislature's intent as to this amendment, " ' "[w]e first examine the statutory language, giving it a plain and commonsense meaning." ' " (*City of San Jose, supra*, 2 Cal.5th at p. 616.)

We find that both Brennon and the District offer plausible interpretations of the text of subdivision (f), which turn on the meaning of the word "violation." Brennon understands this word as referring to a *completed violation.* In other words, when all elements of an ADA violation have been established, the plaintiff will also have proven — automatically — a violation of

28

the Unruh Civil Rights Act. Conversely, the District reads the word "violation" to mean "violative conduct," such that *conduct* that violates the ADA also satisfies the discriminatory conduct element of an Unruh Civil Rights Act claim. Under this view, proof of an ADA violation establishes that the defendant has committed discrimination prohibited by the Unruh Civil Rights Act, but it does not excuse the plaintiff from having to prove the other required elements of an Unruh Civil Rights Act claim — including that the discrimination was committed by a party that is subject to the Act. Although we find the District's interpretation to be the more convincing of the two, we find that neither is definitive and both are reasonable; accordingly, we resort to other tools of statutory interpretation. (See *City of San Jose*, *supra*, 2 Cal.5th at p. 616.)

As we have previously explained: "This amendment was but one part of a broad enactment, originating as Assembly Bill No. 1077 (1991–1992 Reg. Sess.) [Assembly Bill 1077], that sought to conform many aspects of California law relating to disability discrimination (in employment, government services, transportation, and communications, as well as public accommodations) to the recently enacted ADA, which was soon to go into effect." (*Munson*, *supra*, 46 Cal.4th at pp. 668–669.) Ultimately, the amendment added or amended nearly fifty sections across twelve codes. (See Stats. 1992, ch. 913, § 1; see also *Brennon B.*, *supra*, 57 Cal.App.5th at p. 401 [discussing the amendment of "numerous provisions of the FEHA"].)

As we observed in *Munson*, the Legislature explained that the general intent of Assembly Bill 1077 was " 'to strengthen California law in areas where it is weaker than the Americans with Disabilities Act of 1990 (Public Law 101-336) and to retain California law when it provides more protection for individuals

with disabilities than the Americans with Disabilities Act of 1990.' " (*Munson, supra,* 46 Cal.4th at p. 669, quoting Stats. 1992, ch. 913, § 1, p. 4282.) As is relevant here, in addition to adding "persons with mental disabilities" to the classes of individuals protected by the Unruh Civil Rights Act, Assembly Bill 1077 — through the addition of subdivision (f) — made available a private right of action for ADA violations. However, the addition of subdivision (f) was not intended to effectuate a sea change in the operation of the Act by subjecting a vastly expanded set of entities to liability for the first time in the law's history. The Act retained, as it always had, the limitation that the law applied to the acts of "business establishments" — the amendment did not eliminate that provision from the Act. Such a modification would have far exceeded the goal of conforming the Unruh Civil Rights Act to the ADA and, as discussed below, would have rendered the Legislature's amendment of other civil rights statutes superfluous.

Shortly after its introduction in March 1991, Assembly Bill 1077 was revised to include language that would amend the Unruh Civil Rights Act; as of April 18, 1991, the bill proposed to add the following text to section 51 of the Civil Code: "A violation of the right of any individual under the Americans With Disabilities Act of 1990 (Public Law 101-336) *with respect to public accommodations subject thereto* shall also constitute a violation of this section." (Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Apr. 18, 1991, § 2, italics added.) The Legislative Counsel's Digest explained that part of the bill, containing the new Unruh Civil Rights Act language, as follows: "Existing provisions of the Unruh Civil Rights Act, with certain exceptions, prohibit various types of discrimination *by business establishments*. [¶] This bill would make a violation of the

Americans with Disabilities Act of 1990, *with respect to public accommodations*, also a violation of the Unruh Civil Rights Act." (Legis. Counsel's Dig., Assem. Bill No. 1077 (1991 –1992 Reg. Sess.), italics added.) Following this early modification, the bill's language — containing the phrase "with respect to public accommodations subject thereto" — remained unchanged almost until the final passage of the bill (which occurred in August 1992), when it was amended once more in July 1992. (See *Brennon B.*, *supra*, 57 Cal.App.5th at p. 399.) At that time, "the language was shortened to read as it [still] does: 'A violation of the right of any individual under the Americans with Disability Act of 1990 (Public Law 101-336) shall also constitute a violation of this section.' " (*Ibid.*, quoting Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended July 6, 1992, § 3.)

However, despite the bill's revised wording, "[t]he description of the language in committee reports and bill analyses also remained exactly as before." (*Brennon B.*, *supra*, 57 Cal.App.5th at p. 399, citing Conc. in Sen. Amends., Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Aug. 29, 1992, p. 1; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended Aug. 29, 1992, p. 2; State and Consumer Services Agency, Enrolled Bill Rep. on Assem. Bill No. 1077 (1991–1992 Reg. Sess.) p. 2.) In other words, descriptions of the bill continued to refer to its purpose as making a violation of the ADA "*with respect to public accommodations*" also a violation of the Unruh Civil Rights Act. (*Brennon B.,* at p. 398, italics added.)

In addition, the changes made to the bill's language by the July amendment were described by one committee as " 'mostly technical.' " (*Brennon B., supra*, 57 Cal.App.5th at p. 399,

quoting Business, Transportation & Housing Agency, Supp. Analysis on Assem. Bill No. 1077 (1991–1992 Reg. Sess.) as amended July 6, 1992, p. 1.) There is no indication that *substantive* changes were effectuated by this "*technical*" change in the bill's language. Throughout the entire legislative history of Assembly Bill 1077, the bill was understood as dealing with "discrimination *by business establishments*" and violations of the law "with respect to *public accommodations*." (Legis. Counsel's Dig., Assem. Bill No. 1077 (1991–1992 Reg. Sess.), italics added.) There is no suggestion that removal of the phrase "with respect to public accommodations subject thereto" shortly before the bill was enacted was intended to make the Unruh Civil Rights Act broadly applicable to all entities capable of violating the ADA or to make violations of the ADA *by any person or entity* a violation of the Unruh Civil Rights Act. Such a change would have been a monumental one, not merely a "technical" one.

Thus, the Court of Appeal was correct to conclude that subdivision (f) makes "any violation of the ADA *by a business establishment*" a violation of the Unruh Civil Rights Act. (*Brennon B.*, *supra*, 57 Cal.App.5th at p. 398.) If the Legislature had intended to change the meaning of the bill's text through the July revisions, it would be odd for the legislative history to obscure — rather than clarify — that fact by failing to reflect such a change in subsequent committee reports and bill analyses. (See, e.g., *Gong v. City of Rosemead* (2014) 226 Cal.App.4th 363, 375 ["We submit that if the Legislature desired to enact such a major change . . . , it would have clearly stated so"].) And it would be odder still to describe such monumental changes as "mostly technical." If the Legislature had intended to allow — for the first time in the more than thirty years since the Unruh Civil Rights Act was first enacted — a vastly

expanded set of entities to be sued for disability discrimination (but not any other kind of discrimination, such as race- or gender-based discrimination), we would have expected at least some discussion of that change in the legislative history. But there is none.

Moreover, even looking beyond the July modifications to Assembly Bill 1077, we find no mention anywhere in the legislative history of an intention to subject state actors to new liability under the Unruh Civil Rights Act. For example, there are numerous fiscal analyses contained in the bill's legislative history, but none indicated increased financial liabilities for public entities under the Act. (See, e.g., Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 1077 (1991–1992 Reg. Sess.) prepared for Governor Wilson (Sept. 11, 1992) p. 2 [discussing many changes that would have a fiscal impact, but not mentioning liability for public entities under the Act].) Again, we do not expect the Legislature to make such significant changes to the law "without a single comment or any explanation" in the legislative history. (*Presbyterian Camp & Conference Centers, Inc. v. Superior Court* (2021) 12 Cal.5th 493, 511 (*Presbyterian Camp*); see also *People v. Raybon* (2021) 11 Cal.5th 1056, 1068 ["if the drafters had intended to so dramatically change the law[] . . . , we would expect them to have been more explicit about their goals"].)

That conclusion is further supported by the fact that the legislative history describes other changes effectuated by the law (such as the addition of "persons with mental disabilities" to the classes of individuals protected by the Unruh Civil Rights Act and the provision of a private right of action for ADA violations), but does not mention the dramatic one argued by Brennon. (Cf. *Presbyterian Camp*, at p. 511.) As the Court of

Appeal summarized: "We thus see no indication the Legislature intended, as to disability discrimination only, to transform the [Unruh Civil Rights Act] into a general antidiscrimination statute making any violation of the ADA by any person or entity a violation of the Act." (*Brennon B.*, *supra*, 57 Cal.App.5th at p. 400.)

As with our analysis of subdivision (b), we find that the conclusion compelled by the legislative history of subdivision (f) draws additional support from our prior caselaw. In cases since the 1992 amendment, we have continued to describe the Unruh Civil Rights Act — even when specifically examining the relationship between it and the ADA — as intended to " 'create and preserve a nondiscriminatory environment in California *business establishments.*' " (*Munson*, *supra*, 46 Cal.4th at p. 673, quoting *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 167.)

To the extent Brennon contends *Munson* stated that subdivision (f) made *any* violation of the ADA — whether committed by a business establishment or another entity — a violation of the Act, we reject this contention. *Munson* addressed the discrete issue of whether a plaintiff seeking Unruh Civil Rights Act damages premised on a violation of the ADA must show intentional discrimination. (*Id.* at p. 665.) Brennon focuses on language in *Munson* that states: "By adding subdivision (f) to section 51, making all ADA violations . . . violations of the Unruh Civil Rights Act as well, the Legislature included ADA violations in the category of 'discrimination' contrary to section 51." (*Id.* at p. 672.) However, when read in the broader context of the opinion, it is clear that *Munson* did not understand subdivision (f) as reading the "business establishments" limitation out of existence. For example, the

court went on to explain: "The ADA, as explained above, *permits a disabled individual denied access to public accommodations* to recover damages in a government enforcement action only, not through a private action by the aggrieved person. But by incorporating the ADA into the Unruh Civil Rights Act, California's own civil rights law *covering public accommodations*, which does provide for such a private damages action, the Legislature has afforded this remedy to persons injured by a violation of the ADA." (*Id.* at p. 673, italics added.)

As this passage makes clear, in *Munson*, the court was speaking about only one title of the ADA (title III, which governs public accommodations and which is separate from title II, governing state and government actors) and was articulating rules about discrimination by *business establishments*. It was not purporting to do away with the "business establishments" limitation of the Unruh Civil Rights Act. (See also, e.g., *Jankey v. Lee* (2012) 55 Cal.4th 1038, 1044 [continuing to describe the Act as a law that "broadly outlaws arbitrary discrimination in public accommodations"].) Again, we agree with the Court of Appeal below that "the Act has always been, and remains, a business establishment statute, and that it is violations of the ADA *by* business establishments (or, as denominated by the ADA, 'public accommodations') that are actionable as violations of the [Unruh Civil Rights Act] under Civil Code section 51, subdivision (f)." (*Brennon B.*, *supra*, 57 Cal.App.5th at p. 404.) None of our prior cases, including *Munson*, have read this requirement out of the law.

Furthermore, we have also previously held that "the Unruh Civil Rights Act has no application to employment discrimination." (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 77 (*Rojo*), citing *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 500

(*Alcorn*) ["there is no indication that the Legislature intended to broaden the scope of section 51 to include discriminations other than those made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers"]; see also *Isbister*, *supra*, 40 Cal.3d at p. 83, fn. 12 ["the *employer-employee* relationship was not covered by the Act"].) Title I of the ADA covers employment discrimination. (42 U.S.C. § 12111 et seq.) Accordingly, if Brennon is correct and *all* ADA violations are also violations of the Unruh Civil Rights Act without qualification, then the Unruh Civil Rights Act would necessarily apply to employment discrimination, contrary to what we have previously held. Thus, Assembly Bill 1077 either abrogated these prior holdings by making violations of title I of the ADA actionable under the Unruh Civil Rights Act, or the cases remain good law and refute the contention "that *any* violation of the ADA is also a violation the [Unruh Civil Rights Act]." (*Brennon B.*, *supra*, 57 Cal.App.5th at p. 402.)

We conclude that Assembly Bill 1077 did not silently abrogate *Alcorn* and *Rojo*. We agree with the Court of Appeal's conclusion that Brennon's argument on this point "would effectively render superfluous amendments made by this same legislation to . . . FEHA." (*Brennon B.*, *supra*, 57 Cal.App.5th at p. 401.) If *any* violation of the ADA were a violation of the Unruh Civil Rights Act, a violation of title I of the ADA, which prohibits disability discrimination in employment, would also violate the Unruh Civil Rights Act. But the Legislature went out of its way to incorporate title I of the ADA into FEHA; if Brennon's interpretation were correct, those changes to FEHA would be rendered "meaningless surplusage." (*Ibid.*; see also *Bass v. County of Butte* (9th Cir. 2006) 458 F.3d 978, 982 (*Bass*) [noting that this argument "would create a significant disharmony"

between the Unruh Civil Rights Act and FEHA and "create an end-run around the administrative procedures of FEHA solely for disability discrimination claimants"].) We seek to avoid "interpretations that render any language surplusage." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1097.) Accordingly, we reject the idea that "any violation of the ADA by any person or entity is also a violation of the [Unruh] Act." (*Brennon B.*, at p. 398.)

Brennon and amici curiae highlight several federal cases that have concluded that "the Unruh Act has adopted the full expanse of the ADA." (*Presta v. Peninsula Corridor Joint Powers Bd.* (N.D.Cal. 1998) 16 F.Supp.2d 1134, 1135.) But once again, these federal cases fail to persuade, in light of what is compelled by the legislative history and reinforced by our prior cases. The federal cases cited by Brennon and the amici curiae who support his position engage in no — or very little — analysis of the relationship between the Unruh Civil Rights Act and the ADA, the legislative history of Assembly Bill 1077, or our prior caselaw. (See, e.g., *Lentini v. California Center for the Arts, Escondido* (9th Cir. 2004) 370 F.3d 837, 847 [concluding that "the Unruh Act has adopted the full expanse of the ADA"]; *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.* (9th Cir. 2013) 725 F.3d 1088, 1094, fn.1 ["[u]nder California law, 'a violation of the ADA is, *per se,* a violation of the Unruh Act,'" quoting *Lentini*]; *Molski v. M.J. Cable, Inc.* (9th Cir. 2007) 481 F.3d 724, 731 [noting, without any analysis, that "[a]ny violation of the ADA necessarily constitutes a violation of the Unruh Act"]; *Cohen v. City of Culver City* (9th Cir. 2014) 754 F.3d 690, 701 ["a violation of the ADA constitutes a violation of the Unruh Act"]; *Presta*, at p. 1135 [concluding that "all violations of the ADA are actionable under the Unruh Act" and citing an unpublished

district court case as support for that proposition]; *R.N. v. Travis Unified Sch. Dist.* (E.D.Cal., Dec. 8, 2020, No. 2:20-CV-00562-KJM-JDP) 2020 WL 7227561, at *10.)

Notably, the federal case that did "undert[ake] a thorough examination" (*Brennon B., supra*, 57 Cal.App.5th at p. 407) of the legislative history of Assembly Bill 1077 and our prior decisions, also rejected the argument that Assembly Bill 1077 incorporated the complete expanse of the ADA (see *Bass, supra*, 458 F.3d at p. 983 [reading the amendment "in the context of California's overall scheme of statutory protections against discrimination" and noting "the absence of any express indication by the state legislature that it intended . . . to drastically expand the [statute's] subject matter," to conclude that the Unruh Civil Rights Act includes "only those provisions of the ADA that are germane to [its] original subject matter"]). Like the Court of Appeal, we conclude that *Bass* "correctly analyzed Civil Code section 51, subdivision (f)" and rightly concluded "that it expressly makes any violation of the ADA *by a business establishment* a violation of the [Unruh Civil Rights Act]." (*Brennon B.*, at p. 408.)

Accordingly, we reject the contention that — even if it is not acting as a business establishment under subdivision (b) of section 51 — a school district can still be sued for discrimination by virtue of subdivision (f) of that section, which makes violations of the ADA violations of the Unruh Civil Rights Act. Instead, subdivision (f) means that "any violation of the ADA *by a business establishment* is also a violation of the [Unruh Civil Rights Act]." (*Brennon B., supra*, 57 Cal.App.5th at p. 398.)

## C.

Brennon asks the court to consider whether Unruh Civil Rights Act remedies have been incorporated into the relevant provisions of the Education Code, such that he is entitled to the Act's enhanced penalties, even if the District is not subject to liability as a business establishment. He asserts that a 1998 Education Code amendment, stating that Education Code remedies "may be combined" with certain other statutory remedies (Ed. Code, § 201, subd. (g)), means that schools subject to the Education Code are also subject to the enhanced penalties made available under the Unruh Civil Rights Act. In this way, Brennon argues that the 1998 Education Code amendment essentially incorporated the Act's penalties into the Education Code. The District contends this question is beyond the scope of review.

The Court of Appeal below did not address the Education Code argument Brennon now asserts (that Unruh Civil Rights Act remedies have been incorporated into the Education Code), but it did analyze a different Education Code argument he asserted below: whether the 1998 Education Code amendment "demonstrates California public school districts are business establishments under the Act." (*Brennon B., supra*, 57 Cal.App.5th at p. 393.) In other words, below, Brennon asserted that the language of Education Code section 201, subdivision (g) indicated the Legislature intended to treat public school districts as "business establishments" under the Unruh Civil Rights Act; now, he asserts that — even if the District is not subject to Unruh Civil Rights Act liability as a business establishment — he can nonetheless seek the Act's enhanced remedies because those remedies have been incorporated into the Education Code.

We agree with the Court of Appeal that the amended language of Education Code section 201 "does not say public school districts are business establishments under the Unruh Act." (*Brennon B.*, *supra*, 57 Cal.App.5th at p. 396.) Like the court below, we find that bringing public school districts within the ambit of the Unruh Civil Rights Act would have exceeded the stated intention behind the 1998 amendment and been in tension with the Legislature's professed goal of mitigating litigation costs for schools.[10] (*Id.* at pp. 393–397.) Additionally, we are not persuaded — in light of the mootness of this case in which no Education Code claim was pleaded — to reach the

---

[10] Numerous legislative committees noted that the 1998 amendment "d[id] not redefine or expand existing non-discrimination statutes." (Sen. Appropriations Com., Fiscal Summary, Assem. Bill No. 499 (1997–1998 Reg. Sess.) as amended July 22, 1998, p. 1; see also, e.g., Assem. Appropriations Com., Fiscal Summary, Assem. Bill No. 499 (1997–1998 Reg. Sess.) as amended July 22, 1998, p. 1 [same].) In addition, there was little or no discussion of potential financial liabilities for public entities in any of the fiscal analyses of the amendment available in the bill's legislative history. (See, e.g., Dept. of Finance, Enrolled Bill Report on Assem. Bill No. 499 (1997–1998 Reg. Sess.) as amended July 22, 1998, p. 1 ["No fiscal impact. Potential savings to educational institutions if they are able to resolve problems administratively during the waiting period"].) This is notable because the fiscal impact of Brennon's proposed interpretation — that the amendment to the Education Code would have allowed public school districts to be sued under the Unruh Civil Rights Act for the first time — would have been significant. Moreover, Brennon's argument on this point is even less convincing than it was in the context of subdivision (f) of section 51, as this argument would make school districts liable for *all* forms of discrimination (not just disability discrimination), without *any* discussion of such a sweeping change anywhere in the legislative history.

remedy-incorporation theory Brennon now raises for the first time.

## D.

Brennon asks us to decide whether his second amended complaint can be amended to state a cause of action under the Unruh Civil Rights Act or Education Code. However, as he concedes, because "the parties hav[e] settled, the question may be moot as to them." The question of whether Brennon could have amended a complaint that has since been dismissed is entirely theoretical at this juncture. Accordingly, the court does not decide this issue. (See *People ex rel. Lynch v. Superior Court* (1970) 1 Cal.3d 910, 912, citing Cal. Const., art. III, § 1; art. VI, §§ 10, 11 ["The rendering of advisory opinions falls within neither the functions nor the jurisdiction of this court"].)

## E.

We again emphasize that our resolution of the legal issues before us does not turn upon our personal views about the wisdom of the statutes at issue or the question of whether they provide sufficient protection to those who suffer discrimination; instead we are tasked with resolving a question of statutory interpretation. (*See, e.g., Warfield, supra,* 10 Cal.4th at p. 598.) As the parties and the amici curiae make clear, there are exceedingly compelling, yet competing, policy concerns implicated by this case. Policy arguments, no matter how persuasive, cannot overcome a clear legislative intent derived from statutory text and appropriate extrinsic sources. Nevertheless, we briefly address some of the arguments here, given the extensive emphasis placed on them in the briefing.

Brennon asserts that including public school districts within the category of "business establishments" would help to

vindicate students' rights, support the state's policy against discrimination, promote the full integration of people with disabilities into public life, and ensure the safety of students in California's public schools. (See Cal. Const., art. I, § 28, subd. (a)(7) [students "have the right to be safe and secure in their persons"]; see also *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 870, fn. 3 [noting "the fundamental public policy favoring measures to ensure the safety of California's public school students"].) We acknowledge that discrimination in California, including within public schools, continues to be a cause for considerable concern and attention, and its elimination remains a key policy focus. (See *City of Moorpark v. Superior Court* (1998) 18 Cal.4th 1143, 1161 ["discrimination based on disability . . . violates a 'substantial and fundamental' public policy"].)

Brennon further argues that because the Unruh Civil Rights Act is one of the few statutes to provide for the recovery of both damages and attorney fees, it is uniquely well equipped to make private enforcement actions feasible. (See *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 933 ["without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible"].) He contends that, compared to other antidiscrimination laws, the remedies available under the Act are significant; Brennon argues that a successful plaintiff can aggregate statutory penalties for each and every offense, recovering treble damages for each one (a proposition the District disputes); that the Act imposes a statutory damage floor of $4,000 (even if actual damages are less); and that the Act allows only the prevailing plaintiff (but not prevailing defendants) to recover attorney fees.

Amici curiae supporting Brennon's position also note that advocates have often used the possibility of having to pay damages and attorney fees to encourage school districts to institute systemic changes — prior to any litigation — by amending or eliminating harmful school policies and practices. And amici curiae argue that the inability to pursue statutory penalties and attorney fees will make discrimination cases too costly (and therefore too risky), such that attorneys will be unwilling to handle many of these kinds of cases. In light of the fact that, according to amici curiae, California public schools serve 749,295 students with disabilities (meaning one in eight California public school students has a disability), and the fact that, according to amici curiae, those children face increased rates of assault, bullying and harassment, high rates of segregation from other students, and heightened rates of excessive use of force by law enforcement and school authorities, the importance of these considerations cannot be overstated.

For its part, the District argues, invoking *Wells*, that "in light of the stringent revenue, appropriations, and budget restraints under which all California governmental entities operate" (*Wells*, *supra*, 39 Cal.4th at p. 1193), subjecting public school districts to financial liabilities does not come without significant drawbacks and doing so could impede the ability of local governments (and the state) to provide free public education.[11] As evinced by the passage of Assembly Bill 499,

---

[11]  The District's point about the significant fiscal impact of Brennon's position is further underscored by the fact that several of the policy arguments advanced by Brennon and the amici supporting him extend well beyond the public education context and seemingly apply to *all* public entity defendants.

which imposed a 60-day cooling-off period before civil remedies may be pursued against a school district, the Legislature has expressed concern about — and acted to reduce — litigation costs for public schools. In addition, public entities like school districts remain subject to other antidiscrimination laws. (See, e.g., *Brennon B.*, *supra*, 57 Cal.App.5th at p. 370 [noting "the panoply of antidiscrimination statutes" to which public school districts are subject, including those in the Education Code (Ed. Code, § 200 et seq.), the Government Code (Gov. Code, § 11135), and various federal laws (42 U.S.C. § 1983; 20 U.S.C. § 1681 et seq.; 42 U.S.C. § 12131 et seq.)].) Although — as amici curiae point out — those laws may not afford the same remedies made available by the Unruh Civil Rights Act and may be more difficult to litigate,[12] "that circumstance cannot justify extending the scope of the Unruh Civil Rights Act further than its language reasonably will bear." (*Curran, supra,* 17 Cal.4th at p. 701; cf. *Wells, supra*, 39 Cal.4th at pp. 1195–1196 ["The Legislature is aware of the stringent revenue, budget, and

---

Taken to their rational endpoint, such arguments would significantly expand the scope of the Act's coverage provision and undermine the "business establishments" limitation written into the statutory text — a limitation we are not permitted to read out of the statute in response to policy arguments.

[12]    For example, pursuant to subdivision (f) of section 51, a plaintiff may recover statutory damages under the Unruh Civil Rights Act without proving that the defendant's discrimination was intentional, while under title II of the ADA, a plaintiff must succeed in proving intentional discrimination to recover monetary damages. (Compare *Munson, supra,* 46 Cal.4th at p. 670 [explaining recovery under the Unruh Civil Rights Act] with *Duvall v. County of Kitsap* (9th Cir. 2001) 260 F.3d 1124, 1138 [explaining recovery under title II of the ADA].)

appropriations limitations affecting all agencies of government — and public school districts in particular. Given these conditions, we cannot lightly presume an intent to [subject these entities to large financial liabilities]. Such a diversion of limited taxpayer funds would interfere significantly with government agencies' fiscal ability to carry out their public missions," fn. omitted].)

The proper balancing of these competing priorities is ultimately and unquestionably "a policy issue that lies within the province of the legislative, rather than the judicial, branch." (*Curran, supra,* 17 Cal.4th at p. 701.) As we have noted before, subject to constitutional constraints, the Legislature may "extend the provisions of the Unruh Civil Rights Act to additional entities" or "enact new legislative measures to address any gaps or inadequacies that it finds in the current statutory provisions." (*Ibid.*) It may also decide that it is preferable to maintain existing limitations on the liability of public entities. Some states have decided to include schools and public school districts in their definitions of public accommodations,[13] while others have continued to exclude them[14] — it appears, however, that the several states that have

---

[13] See, e.g., N.J. Stat. Ann. § 10:5-5(*l*) (including "any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university" in its definition of public accommodation).

[14] See, e.g., *Whitman-Singh v. Comm'n on Human Rights and Opportunities* (Conn.Super.Ct., Nov. 22, 2021, No. HHBCV206061006S) 2021 WL 5912321, at *1 (concluding that "a public school is not a place of public accommodation" because "the phrase 'place of public accommodation' has a long-settled meaning" that "refers to *private* establishments, enterprises and

recognized public schools or public entities as public accommodations have done so expressly via statute, not through court decisions. As described above (see fn. 6, *ante*), the Legislature recently enacted new accommodation and antidiscrimination protections for certain groups of public school students, and it is free to enact additional protections against discrimination in the future. But we conclude that the Unruh Civil Rights Act *as currently written* cannot reasonably be interpreted to encompass public school districts in situations such as this one.

### III.

For the reasons discussed above, neither subdivision (b) nor subdivision (f) of section 51 enables Brennon to proceed against the District under the Unruh Civil Rights Act, nor does the reference to the Act in the Education Code. Accordingly, we affirm the judgment of the Court of Appeal denying the petition for writ of mandate.

**GROBAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**GUERRERO, J.**

---

organizations that cater or offer their services and facilities to the general public" and "does not include government entities"); *Gandy v. Howard County Bd. of Educ.* (D.Md. Sept. 1, 2021. GLR-20-3436) 2021 WL 3911892, at *10 (concluding that a Maryland public school is not a place of public accommodation).

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Brennon B. v. Superior Court

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 57 Cal.App.5th 367
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S266254
**Date Filed:** August 4, 2022

_____

**Court:**  Superior
**County:**  Contra Costa
**Judge:**  Charles S. Treat

_____

**Counsel:**

Liberty Law Office, Micha Star Liberty; and Alan Charles Dell'Ario for Petitioner.

The Arkin Law Firm, Sharon J. Arkin; Law Offices of Charles S. Roseman & Associates, Charles S. Roseman, Richard D. Prager; Law Offices Of Frank M. Nunes and Frank M. Nunes for Consumer Attorneys of California, Thomas Emmanuel Akande, Anahi Alfaro, Maria "Nikki" Cantos, Jasmine Castaneda, Taylor Chumley, Omar Estrada, Annadina Garcia, Gabriel Garcia, Diego Guzman, Bao Her, Ana Landeros, Helizabela Lee, Caitlyn Lindley, Alexis Lopez, Jorge Lopez-Pardo, Bailey Matney, Bolivar Quezadas, Abdiel Rosales, Myra Rubio, Rina Saengkeo, Arianna Singh, Narinderp Al Singh, Oleksandr Volyk and Amy Zendejas as Amici Curiae on behalf of Petitioner.

Linda D. Kilb and Claudia Center for Disability Rights Education & Defense Fund as Amicus Curiae on behalf of Petitioner.

Jinny Kim and Alexis Alvarez for AIDS Legal Referral Panel, Arc of California, Association on Higher Education and Disability, California Association for Parent-Child Advocacy, Civil Rights Education and Enforcement Center, Communication First, Disability Rights Advocates, Disability Rights California, Disability Rights Legal Center, Impact Fund, Legal Aid at Work, Mental Health Advocacy Services and Public Law Center as Amici Curiae on behalf of Petitioner.

Victor Leung, Ana Mendoza, Ariana Rodriguez; Brandon Greene, Linnea Nelson, Grayce Zelphin; and Melissa DeLeon for American Civil Liberties Union of Southern California, American Civil Liberties Union of Northern California, American Civil Liberties Union of San Diego and Imperial Counties, Alliance for Children's Rights, California Rural Legal Assistance, Collective for Liberatory Lawyering, East Bay Community Law Center, Equal Justice Society, Law Foundation of Silicon Valley, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Learning Rights Law Center, National Center for Youth Law, Neighborhood Legal Services of Los Angeles County, Public Advocates, Public Counsel and Youth Justice Education Clinic—Loyola Law School as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Edrington, Schirmer & Murphy, Timothy P. Murphy, Cody Lee Saal; Clyde & Co US, Douglas J. Collodel and Alison K. Beanum for Real Parties in Interest.

Dannis Woliver Kelley, Sue Ann Salmon Evans, David A. Obrand; Keith J. Bray and Robert Tuerck for Education Legal Alliance of the California School Boards Association and the California Association of Joint Power Authorities as Amici Curiae on behalf of Real Party in Interest West Contra Costa Unified School District.

Richard S. Linkert and Madison M. Simmons for Schools Insurance Authority as Amicus Curiae on behalf of Real Party in Interest West Contra Costa Unified School District.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Alan Charles Dell'Ario
Attorney at Law
P.O. Box 359
Napa, CA 94559
(707) 666-5351

Cody Lee Saal
Edrington, Schirmer & Murphy, LLP
2300 Contra Costa Boulevard, Suite 450
Pleasant Hill, CA 94523
(925) 827-3300